IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 9, 2016 at Nashville

**REGGIE CARNELL JAMES v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Madison County**
**No. C-10-126     Donald H. Allen, Judge**

———————————

**No. W2015-01640-CCA-R3-PC  -  Filed March 16, 2016**

———————————

The petitioner, Reggie Carnell James, was convicted in 2007 of first degree murder and tampering with evidence.  He was sentenced to life with the possibility of parole for the murder conviction and ten years for the tampering with evidence conviction, with the sentences to be served consecutively.  This court affirmed his convictions on direct appeal.  State v. Reggie Carnell James, No. W2007-00775-CCA-R3-CD, 2009 WL 636726, at *1 (Tenn. Crim. App. Mar. 10, 2009), perm. app. denied (Tenn. Aug. 17, 2009).  In April 2010, he filed a petition for post-conviction relief, arguing that trial counsel had been ineffective for not filing a motion to suppress a statement the petitioner had made to police officers.  Following a hearing on April 11, 2011, the post-conviction court entered an order on January 31, 2012, denying the petition.  The notice of appeal for this decision was not filed until August 27, 2015.  The State argues on appeal that the notice of appeal was untimely and that, as a result, the appeal should be dismissed.  We conclude that the interest of justice does not require our waiving the late filing of the notice of appeal and, therefore, dismiss the appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Appeal Dismissed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

J. Colin Morris, Jackson, Tennessee, for the appellant, Reggie Carnell James.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; James G. (Jerry) Woodall, District Attorney General; and Shaun A. Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTS

In the opinion of this court affirming the judgments is set out the facts which provided the bases for the petitioner's convictions:

At trial, Roy Lee Clark testified that one evening in May 2005, he arrived at the defendant's house. After a while, Clark left the house and went to a gas station; upon his return, Clark saw that two other men, Roy Gardner and Raymond Thomas (the victim in this case), had arrived. Clark said that he, the defendant, Gardner, and the victim spent fifteen to twenty minutes using cocaine before going outside. Clark said that once outside, the victim spent "about thirty minutes" tilling in the defendant's flower bed before the four men went back inside to use more cocaine. During this time, Clark and the victim sat on a loveseat in the defendant's living room, with the defendant walking back and forth in front of them with a pistol in his hand. Clark said that none of the other three men had a weapon at the time of this incident. After a while, Clark heard a gunshot and then heard the victim "hollering" and asking the defendant why he had shot him. According to Clark, the defendant did not reply to the victim's question. Clark said that he did not see any blood during this incident. At some point after the shooting, the victim slumped over, with his knees on the floor and his upper body on the couch.

Clark testified that after the shooting, he ran to the door in an attempt to leave and get help for the victim, who Clark said was still alive at this point, but that the defendant stood in the doorway and refused to let him take the victim to the hospital. The three men then went outside. According to Clark, the defendant said that "he had to finish what he had started," and that he "wasn't gonna . . . let [the victim] live." At that point, the defendant returned inside while Clark and Gardner remained outside. Clark then heard a gunshot, after which the defendant told the other two men to come inside. They did, and upon entering the living room Clark saw the victim with a gunshot wound "[b]etween his shoulder and his head, by his head." Clark said that at this point, the defendant still had a pistol in his hand. Clark said that the evening after the shooting, he and Gardner were at Gardner's house when the defendant arrived. Clark asked the defendant about the victim, and the defendant replied that the victim "was still on the couch."

2

Clark acknowledged that he was serving a sentence for aggravated assault and that he had three prior convictions for theft of property and convictions for evading arrest and attempted aggravated robbery. On cross-examination, Clark said that because of his daily cocaine use, he was unable to remember the exact date or day of the week on which this incident occurred, although he did remember that the incident occurred in the afternoon. He also said that he was unsure of the date, or even the month, on which this trial was occurring. Clark admitted that he did not see the defendant shoot the victim and that the defendant did not point a gun at him or Gardner. Clark also admitted that he did not hear the defendant threaten him during the incident. Clark said that Gardner later told him that the defendant had threatened Clark's life, but he also admitted that Gardner was a convicted felon. He denied that he, Gardner, and the victim entered into a plot to rob the defendant. He said that when he, Gardner, and the defendant went outside after the shooting, he and Gardner played basketball to avoid arousing the suspicion of the neighbors, who were in the yard next door.

The substance of Roy Gardner's testimony matched much of that provided by Clark. Gardner said that when the defendant shot the victim, he was sitting on a chair next to the loveseat on which the victim and Clark were sitting. Gardner saw the defendant pacing in front of the loveseat, pistol in hand, before he saw the defendant shoot the victim "in his upper body." Gardner asked the defendant to take the victim to the hospital, but the defendant refused. The men then went outside, with the defendant telling Gardner that "if anything was said . . . we would be next." After the men went outside, the defendant told the other men that "he might as well go in there and finish it," at which point the defendant returned inside. Gardner then heard a gunshot.

After the shooting, Gardner and the defendant left in the victim's pickup truck. After visiting a store, they returned to the defendant's house, with Gardner dropping off the defendant and then driving away. Gardner drove the victim's truck to a remote area about a mile from his house, abandoned the truck, and ran home. Gardner said that he did not see the defendant after this incident.

Gardner acknowledged that he was in federal custody for a weapons offense and that he had prior state convictions for criminal impersonation and theft. On cross-examination, Gardner said that he could not remember the exact date on which these events occurred, other than the shooting

3

happened on a May afternoon. He recalled that he and the other men "smoked a lot" that day. He recalled seeing blood on the loveseat, but he was unsure whether the victim was alive or dead when they left the defendant's house the first time. Unlike Clark, Gardner said that he did not see anyone standing in the yard next door. He also had no independent knowledge of what happened to the victim's truck after he abandoned it, although he later learned that it was found burned.

Regarding the police investigation, Deputy David Travis of the Madison County Sheriff's Department testified that on May 26, 2005, he discovered a burned-out vehicle in a field in a rural part of Madison County. Deputy Travis said he was unable to find the vehicle's license plate or its Vehicle Identification Number (VIN), but he did find a vanity license plate which read "Popeye" on the ground in front of the vehicle. Agent Jim Medlin with the Tennessee Highway Patrol (THP) said he inspected the vehicle, which he described as a "Chevrolet or GMC truck," at an impound lot after it had been towed from the field. Agent Medlin was able to find the vehicle's VIN, and after searching vehicle records, he learned that the truck was a white 2001 Chevrolet Silverado registered to the victim and his mother, Pat Thomas.

Lieutenant Anthony Heavner with the Madison County Police Department testified that he originally became involved in this case when the victim's burned pickup truck was recovered in rural Madison County, near the Haywood County line. Ultimately, the nature of the case turned from a "burned vehicle" case to a missing person case. Through his investigation, Lieutenant Heavner learned from the victim's wife that the victim had been at his house on May 18, 2005, and he also learned that when the victim's vehicle was recovered May 26, nobody had reported the vehicle stolen. Lieutenant Heavner provided the victim's name and identifying information for the National Crime Information Center (NCIC) database, and he also notified the National Center for Missing and Exploited Persons about the victim's disappearance. Lieutenant Heavner said that as of the trial date, neither the NCIC nor the Center for Missing and Exploited Persons received any information regarding the victim.

Lieutenant Heavner said that he first investigated the defendant after the victim's wife, who knew that the victim and the defendant "hung out" and used drugs together, informed the police that the defendant had visited her house. Thus, on June 3, 2005, Lieutenant Heavner visited the defendant at his home in Jackson. The defendant told Lieutenant Heavner that he had

4

not seen the victim. On July 1, Lieutenant Heavner returned to the defendant's home after the sheriff's department received an anonymous call in which the caller said that the victim's blood could be found in the defendant's home. After Lieutenant Heavner informed the defendant of this development, the defendant gave police permission to search his house. The defendant told the officers that he was in the process of moving and that there would be little furniture in the house. Once Lieutenant Heavner entered the living room, he saw a spot in the carpet, a spot "larger than a basketball," that appeared to be stained. Lieutenant Heavner initially believed the spot was blood, but when he looked at the spot more closely he saw that the spot "looked like it was full of some type of soapy material." In fact, Lieutenant Heavner later found a bottle of Resolve brand carpet cleaner in the house. He asked the defendant about the spot; the defendant replied that his dogs "might have brought something into the house, some type of animal or something." Before leaving the defendant's house, the lieutenant cut out the section of stained carpet, and the underlying carpet pad, and he took a written statement from the defendant in which he denied any knowledge of the victim's disappearance and said that he had taken the couch to his aunt's house.

Lieutenant Heavner sent the carpet taken from the victim's house to the Tennessee Bureau of Investigation (TBI) for testing. He also sent DNA samples from the victim's wife and children, as well as a sample taken from the victim's razor, to the TBI lab. On August 1, 2005, he again spoke with the defendant, this time in police custody. After being informed of and waiving his Miranda rights, the defendant gave a written statement to police. In the statement, the defendant said that the victim, whom he called "Popeye," came to his house along with Gardner and Clark. The defendant said that he had been "smoking crack non-stop . . . and was high when they came by" and did drugs with the other men before going to another part of the house. The defendant claimed that while he was away from the other men, he heard a gunshot. When he returned to the living room, he saw the victim lying on the floor, with Gardner and Clark standing over him. The defendant said that he did not see any blood at the time but recalled that the victim came to rest on the section of carpet that Lieutenant Heavner removed. The defendant said that Gardner and Clark then "put Popeye in his truck and took him away. I don't know where they took him or if he was dead at that point." The defendant insisted that the two men did not tell him what they did with the victim or his truck.

5

On September 1, after he had taken a statement from Gardner implicating the defendant in the victim's death, Lieutenant Heavner again interviewed the defendant. After waiving his <u>Miranda</u> rights, the defendant gave a statement in which he admitted shooting the victim. In the statement, the defendant claimed that he, the victim, Gardner, and Clark were doing drugs at his house when he became suspicious about their behavior and about the fact that they were carrying screwdrivers and knives. He also claimed that he heard voices in his head because of his drug use. At some point, the defendant "got paranoid" and became fearful that the other men would "do bodily harm to me, kill and rob me because I had drugs." Thus, he shot the victim in the head. The defendant said that he walked around for a while before shooting the victim again, this time in the chest. He said that the victim slumped onto the couch, with the victim's blood soaking through the couch so that a section of carpet underneath the couch became blood-soaked. The defendant claimed that Gardner drove away in the victim's truck and that he never saw the victim's truck again. The defendant said that later, he wrapped the victim's body in a tarp, wrapped a chain around the body, ran the chain through some concrete blocks, drove to a bridge over the Forked Deer River in Westover, and dumped the body into the river. The defendant also said that he threw the gun he used to shoot the defendant, a .40 caliber Ruger 94, into the river.

The defendant led police to a dump where he had left the couch on which the victim was shot. Lieutenant Heavner said that areas on the couch's seat cushions and arm appeared to be soaked with blood. He sent fabric samples from the couch to the TBI lab for testing. The lieutenant observed that the couch appeared to be weather-beaten. In his statement, the defendant said that he "had to get rid of" the couch because it had blood on it. The defendant also admitted cleaning the carpet with Resolve brand carpet cleaner in an attempt to remove the blood stains.

The day of his statement, the defendant led police to the bridge from which he claimed to have dumped the body. Lieutenant Heavner said that on September 1, 2005, the Forked Deer River "was about to overflow its banks" and that the river's current was much swifter than usual because of Hurricane Katrina, which made landfall along the Mississippi Gulf Coast on August 29. Thus, neither the police nor the Madison County Fire Department's rescue squad attempted to search the river that day. On September 2, the fire department attempted to search the river using drag lines, but the river's current made such a search impossible. The fire department searched the river on September 6, and the police searched the

river on September 9, but those searches produced nothing either time. The police also conducted an aerial search, but that search also produced nothing of evidentiary value.

On cross-examination, Lieutenant Heavner said that while he was certain that the victim's wife had reported that the victim had been in her home on May 18 and that the victim's truck was found on May 26, he was unsure of the exact date on which the victim was killed. He also said that he did not recover any shell casings from the couch or the defendant's home, nor did he see any bullet holes in the couch or in the wall or floor of the defendant's home. He did note, however, that the couch had several tears on it, which he attributed to the couch's being "outside in the elements." Lieutenant Heavner said that he only had the couch tested for blood, not gunpowder residue, noting that in his law enforcement experience he had never dealt with evidence of stipling on anything other than the human body. Furthermore, he said that the fact that the couch had been in the elements made it unclear whether there would be any gunpowder residue on the couch.

Sergeant Felicia Stacy with the Madison County Sheriff's Department testified that she was present on September 9, 2005, when THP divers searched the river near the spot where the defendant claimed to have dumped the victim's body. She said that the divers found two concrete blocks attached by a chain, with the manner in which the chain was run through the blocks consistent with the defendant's description. However, on cross-examination she admitted that the divers recovered no clothing items and that there was nothing to conclude with any certainty that the blocks and chain had been used to weigh down a body. Sergeant Stacy testified that she investigated the victim's financial records and discovered that the victim had not accessed any of his accounts since May 2005.

TBI Agent Donna Nelson testified that she tested the sections of carpet and couch fabric collected in connection with this case. She said that while both the carpet and the couch fabric tested positive for human blood, she was unable to obtain a DNA profile from either sample. She said that the carpet's being cleaned with detergent and the couch's being left in the elements could have caused the DNA present in the blood to degrade.

Three members of the victim's family -- his widow, Candice Thomas; his seven-year-old son, Dalton Thomas; and his mother, Pat Thomas -- testified that they had not seen the victim since May 2005 and

7

that they loved him and missed him. Specifically, Candice Thomas testified that she last saw the defendant on May 14, 2005, although she said that her husband had been in the family home on May 18. She said she knew her husband had been in the home that day because some of her belongings had been disturbed. She said that she had monitored her financial records since May 2005 and that there was no indication that her husband had accessed the accounts during that time. She said she knew her husband had a drug problem and that he was occasionally away from the home, but he was never gone more than a week at a time. She said that she was not concerned about her husband's disappearance until his truck, which the victim considered his "pride an[d] joy," was discovered burned. She said that her husband was known as "Popeye" and that he kept a vanity license plate which read "Popeye" on the front of his truck. The victim's widow said that the defendant had visited her house after the victim "went missing" but before his truck was discovered. She recalled that the defendant asked her "if [she] had heard anything," to which she replied she had not.

At the close of the State's proof, the parties stipulated that the victim had not been treated at any of eight major West Tennessee hospitals since his disappearance.

The defendant's only witness, William Merriman, testified that on May 24, 2005, he saw the victim, whom he had known since at least 1975, at a gas station. Merriman said that the victim told him that the two men should take a vacation. Merriman did not recall where the victim wanted to go on vacation.

Id. at *1-6.

The very lengthy petition for post-conviction relief sets out approximately thirty-three claims of ineffective assistance of counsel, seven claims as to unconstitutional sentencing laws and procedures, and a large number of claims as to various trial errors. However, the only proof presented by the petitioner at the evidentiary hearing was the testimony of his trial counsel regarding his decision not to file a motion to suppress a statement made by the petitioner to police officers. Further, the petitioner's appellate brief focused only upon this issue. Accordingly, we will consider only this claim in our review of this matter.

Trial counsel for the petitioner said that he had been appointed to the matter after the return of the indictment. He said the petitioner had given several statements, two of

them to Investigator Hefner, admitting he had shot the victim but claiming it was in self-defense. Counsel did not file a motion to suppress any of the statements, although he and the petitioner discussed doing so. Counsel did not see any point in doing so because, in trial testimony, the petitioner "would have told the jury exactly the same thing that he told [Investigator] Hefner and that is that he shot [the victim] because he was afraid that he was fixing to be jumped on or he was afraid [the victim] was going to pull a knife on him and rob him." Additionally, the petitioner told counsel that the murder "occurred while all these parties were together smoking crack." Counsel and the petitioner agreed they would proceed without filing a suppression motion because the statements "would convey his message to the jury without exposing him to cross-examination." Later, counsel received a letter from the petitioner asking that a suppression motion be filed. Counsel met with him again to explain the advantages of not doing so to allow his statement to take the place of his testimony at trial. Counsel explained that the matter was made "somewhat moot" by the fact that a jail recording had been made with the petitioner talking with a woman "where he pretty much said the same thing that he told Investigator Hefner and told me and, of course, he had no reasonable expectation of privacy as far as that statement was concerned." Accordingly, counsel advised the petitioner against pursuing a motion to suppress, but the final decision was to be made by the petitioner.

Prior to the trial, counsel asked that a forensic evaluation be done of the petitioner, and he was "found to be competent to stand trial and he was found not to be insane." Counsel recalled that the petitioner's drug use was "very extensive" and that the trial court instructed the jury regarding voluntary intoxication. He said that he found the petitioner to be "very personable, very bright" and described further:

He understood the position he was in. He asked all the right questions. I didn't see anything to me to indicate that he was suffering from any mental impairment or deficit. Now, I'm sure whenever he was at the height of his crack cocaine use, perhaps he was impaired. I can't say, but the jury heard ample proof of crack cocaine usage that night[.]

Counsel said that he still considered it was sound strategy not to pursue a motion to suppress, for it kept the petitioner "from being cross-examined and it kept the jury from learning about his felony drug convictions."

On cross-examination, counsel said that he had practiced law for nearly thirty-five years and had handled "[p]robably between 100 and 150" first degree murder cases.

Following the evidentiary hearing, the post-conviction court entered a written order denying the petition for post-conviction relief, finding that the petitioner had failed

9

to establish that trial counsel had provided deficient performance or that such alleged performance had prejudiced the petitioner and, more specifically, that counsel's decision not to pursue a motion to suppress had not amounted to ineffective assistance of counsel and that the petitioner had not established that there was a legal basis upon which the motion would have been granted.

## ANALYSIS

The State argues on appeal that this matter should be dismissed because the appeal was untimely by over three and one-half years, the post-conviction court's order denying relief entered on January 31, 2012, and the notice of appeal not being filed until August 27, 2015. Tennessee Rule of Appellate Procedure 4(a) provides that the notice of appeal must be filed "within 30 days after the date of entry of the judgment appealed from[.]" However, the rule further provides that "in all criminal cases the 'notice of appeal' document is not jurisdictional and the filing of such document may be waived in the interest of justice." Id. As we will explain, we conclude that the interest of justice does not require our waiving the untimeliness of the filing of the appeal notice, and we decline to do so.

Although the petitioner argues that trial counsel should have sought to suppress his initial statement to investigators, he advances no reasons counsel could have argued for doing so. Further, given the significant strength of the proof against the petitioner, as outlined in the direct appeal of his convictions and of additional similar statements he had made, also admitting the crime, we cannot conclude that the interest of justice compels our waiving the untimeliness of this appeal. Accordingly, the appeal is dismissed.

## CONCLUSION

Based upon the foregoing authorities and reasoning, the appeal is dismissed.

_____
ALAN E. GLENN, JUDGE

10